IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| FINTIV, INC., | § | |
| | § | Civil Action No.: 6:18-CV-372-ADA |
| | § | |
| Plaintiff, | § | |
| | § | JURY TRIAL DEMANDED |
| v. | § | |
| | § | |
| APPLE INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |

**<u>APPLE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

TABLE OF ACRONYMS ................................................................................................ iv

I.      CLAIM CONSTRUCTION IS NECESSARY ..................................................... 1

        A.      THE COURT SHOULD CONSTRUE THE CLAIM TERMS TO
                RESOLVE THE PARTIES' DISPUTES ................................................... 2

        B.      THE COURT SHOULD CONSTRUE THE CLAIM TERMS BECAUSE
                THEY ARE TECHNICAL IN NATURE AND POTENTIALLY
                CONFUSING TO THE JURY .................................................................... 5

II.     FINTIV IMPROPERLY IGNORES THE PROVISIONAL APPLICATIONS
        THAT ARE PART OF THE '125 SPECIFICATION ...................................... 6

III.    CLAIM CONSTRUCTIONS ................................................................................ 8

        A.      "WALLET MANAGEMENT APPLET (WMA)" (CLAIMS 11 AND 13) .......... 8

                1.      WMA IS A COINED TERM THAT REQUIRES
                        CONSTRUCTION ........................................................................ 8

                2.      THE COURT SHOULD ADOPT APPLE'S PROPOSED
                        CONSTRUCTION ........................................................................ 9

                        a.      The WMA is a Software Application .......................... 11

                        b.      The WMA Stores Duplicate Account Information ..................... 12

                3.      FINTIV FAILS TO SUPPORT ITS PROPOSED ALTERNATIVE
                        CONSTRUCTION ...................................................................... 14

        B.      "WIDGET" (CLAIMS 11, 18, AND 23) ............................................... 14

        C.      "MOBILE WALLET APPLICATION" (CLAIMS 11, 18, AND 23)................ 18

        D.      "SE INFORMATION" (CLAIMS 14 AND 23) ..................................... 21

        E.      "MOBILE DEVICE INFORMATION" (CLAIMS 14, 18, AND 23)................ 23

        F.      "OVER-THE-AIR (OTA) PROXY" (CLAIM 23) AND "OTA PROXY"
                (CLAIM 16) ......................................................................................... 25

        G.      "PROVISION[ING]" (CLAIMS 11 AND 23) ......................................... 28

IV.     CONCLUSION..................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alloc, Inc. v. Int'l Trade Comm'n,*
    342 F.3d 1361 (Fed. Cir. 2003)............................................................................17

*Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.,*
    262 F.3d 1258 (Fed. Cir. 2001)............................................................................17

*CardSoft, LLC v. VeriFone, Inc.,*
    807 F.3d 1346 (Fed. Cir. 2015)............................................................................16

*Cobalt Boats, LLC v. Brunswick Corp.,*
    773 F. App'x 611 (Fed. Cir. 2019) ........................................................................2

*Cook Biotech, Inc. v. Acell, Inc.,*
    460 F.3d 1365 (Fed. Cir. 2006).............................................................................7

*Finjan, Inc. v. Secure Computing Corp.,*
    626 F.3d 1197 (Fed. Cir. 2010).........................................................................4, 5

*In re Abbott Diabetes Care, Inc.,*
    696 F.3d 1142 (Fed. Cir. 2012).........................................................13, 15, 18, 19

*Iridescent Networks, Inc. v. AT&T Mobility, LLC,*
    933 F.3d 1345 (Fed. Cir. 2019).........................................................8, 10, 11, 18

*Kraft Foods, Inc. v. Int'l Trading Co.,*
    203 F.3d 1362 (Fed. Cir. 2000).......................................................................15, 16

*MarcTec, LLC v. Johnson & Johnson,*
    664 F.3d 907 (Fed. Cir. 2012)...............................................................................7

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
    357 F.3d 1340 (Fed. Cir. 2004)............................................................................17

*Multiform Desiccants, Inc. v. Medzam, Ltd.,*
    133 F.3d 1473 (Fed. Cir. 1998)............................................................................16

*Neomagic Corp. v. Trident Microsystems, Inc.,*
    287 F.3d 1062 (Fed. Cir. 2002)............................................................................29

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
    521 F.3d 1351 (Fed. Cir. 2008).......................................................1, 2, 3, 4, 9, 18

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)...........................................................................23

*Renishaw PLC v. Marposs Societa' per Azioni*,
   158 F.3d 1243 (Fed. Cir. 1998)...........................................................................19

*Seachange Int'l, Inc. v. C-COR, Inc.*,
   413 F.3d 1361 (Fed. Cir. 2005)...........................................................................17

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
   775 F.2d 1107 (Fed. Cir. 1985)...........................................................................29

*Stasher, Inc. v. Zip Top, LLC et al.*,
   No. W-18-cv-00312-ADA (W.D. Tex. Jun. 7, 2019)...........................................28

*Toro Co. v. White Consol. Indus.*,
   199 F.3d 1295 (Fed. Cir. 1999)...........................................................................17

*Trivascular, Inc. v. Samuels*,
   812 F.3d 1056 (Fed. Cir. 2016)...........................................................................23

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
   811 F.3d 1359 (Fed. Cir. 2016).........................................................6, 11, 19, 20, 24

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997)....................................................................3, 4, 5

*VirnetX, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014)..............................................................10, 11, 12, 15

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996)........................................................................23, 25

*Whirlpool Corp. v. TST Water, LLC*,
   No. 2:15-cv-1528-JRG, 2016 WL 3959811 (E.D. Tex. July 22, 2016)..............5, 6, 14, 21, 29

## <u>TABLE OF ACRONYMS</u>

**CCA**:  Contactless Card Applet

**NFC**:  Near Field Communications

**MNO**:  Mobile Network Operator

**OTA**:  Over-the-Air

**POS**:  Point of Sale

**SE**:  Secure Element

**SP**:  Service Provider

**TSM**:  Trusted Service Manager

**WMA**:  Wallet Management Applet

**WMS**:  Wallet Management System

The Court should construe the seven claim terms at issue to resolve the parties' disputes regarding claim scope[1] and to assist the jury in understanding the technical terminology of the asserted claims.  To adopt across-the-board "no construction needed" approach to claim construction advocated in Fintiv's Opening Claim Construction Brief ("Fintiv Opening Br.") (D.I. 72) would improperly place the resolution of claim construction disputes—which is the exclusive purview of the Court—in the hands of the jury.  This, the Court should not do.

When the full intrinsic record is examined, it is clear that Apple's proposed claim constructions should be adopted.  Fintiv's Opening Brief failed to acknowledge—let alone consider—the four provisional applications which are incorporated by reference into the specification of the asserted patent (U.S. Pat. No. 8,843,125 (the "'125 patent")).  As set forth in Apple's Opening Claim Construction Brief ("Apple Opening Br.") (D.I. 71) and herein, the Court should adopt Apple's proposed constructions which are commensurate with the scope of the alleged invention as set forth in the claims and throughout the *entirety* of the specification's written description.

## I.   CLAIM CONSTRUCTION IS NECESSARY

Claim construction is a critical part of nearly every patent infringement case, and this case is no exception.  Claim construction is necessary here for two primary reasons: (1) to resolve the parties' disputes regarding the scope of the claims; and (2) to reduce the likelihood of jury confusion about the meaning of the technical terminology of the claims.  Fintiv's proposal of "plain and ordinary meaning" for all of the disputed terms is tantamount to no proposal at all, and if adopted by the Court, the parties' clear disputes regarding scope will not be resolved.  The Federal Circuit has said failing to resolve a clear dispute as to claim scope by adopting "plain and ordinary meaning" is legal error.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521

---

[1] The claim scope disputes are apparent by comparing Apple's constructions with Fintiv's alternative constructions.  *See* Supplemental Declaration of Travis Jensen in Support of Apple's Responsive Claim Construction Brief ("Jensen Supp. Dec."), Ex. 21 (side-by-side comparison of competing constructions).

F.3d 1351, 1361 (Fed. Cir. 2008).  Therefore, a construction of each proposed claim term is necessary, as outlined below.

### A.    The Court Should Construe the Claim Terms to Resolve the Parties' Disputes

As in the overwhelming majority of patent cases, the parties here dispute the scope of the asserted claims.  Apple proposed seven claim terms for construction: (1) "wallet management applet (WMA)," (2) "widget," (3) "mobile wallet application," (4) "SE information," (5) "mobile device information," (6) "over-the-air (OTA) proxy," and (7) "provision[ing]."  With the sole exception of the term "provision[ing],"[2] the parties' dispute what each of these claim terms means in the context of the '125 patent.  The parties' divergent views regarding the scope and meaning of these claim terms are apparent from the opening claim construction briefs and by comparing the parties' proposed constructions.  *See* Jensen Supp. Dec., Ex. 21 (side-by-side comparison of competing constructions).

While the specific disputes regarding each term are discussed in further detail in their respective sections below, the claim term "wallet management applet (WMA)" provides an example of the type of disputes that exist between the parties.  Among other things, Apple contends that a WMA must store a duplicate copy of a user's account information.  Fintiv contends that "the specification does not require, as Apple's construction proposes, that the 'wallet management applet' store duplicate account specific information."  Fintiv Opening Br. at 9.  This is a clear dispute as to the scope of the term "WMA," which must be resolved by the Court.  *O2 Micro*, 521 F.3d at 1361; *see also Cobalt Boats, LLC v. Brunswick Corp.*, 773 F. App'x 611, 614 (Fed. Cir. 2019) (unpublished).

---

[2] Apple has offered to stipulate to Fintiv's alternative construction so there is no dispute about the meaning of the term "provision[ing]."  Fintiv has refused Apple's offer, insisting that the term should not be construed.  Thus, the only dispute is whether the term should be construed at all.  Apple believes construction is necessary because of the technical context in which the term appears.  *See infra* section III.G.

Fintiv, however, incorrectly argues that no claim terms should be construed.  Fintiv Opening Br. at 1 ("Fintiv does not believe that any terms of the '125 Patent require construction.").  The only reason Fintiv gives for not construing the terms is its own bald assertion that each disputed term has a plain and ordinary meaning to a person of ordinary skill in the art ("POSITA").  *See id*. at 5, 10, 11, 13, 14, 15 and 17.[3]  But that argument was squarely rejected in *O2 Micro* where the Federal Circuit explained that "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."  521 F.3d at 1361.  The parties in *O2 Micro* agreed that the term "only if" had a plain and ordinary meaning but disputed what that meaning was.  *Id*.  The district court declined to construe the term, reasoning that it "has a well-understood definition, capable of application by both the jury and this court in considering the evidence submitted in support of an infringement or invalidity."  *Id*.  But the Federal Circuit held that was error because doing so "[did] not resolve the parties' dispute, and claim construction requires the court to determine what claim scope is appropriate in the context of the patents-in-suit."  *Id*.

Such is the case here.  Merely stating that the claim terms "widget," "mobile wallet application," "SE information," and "mobile device information" have their "ordinary meaning" would not resolve the parties' disputes because each party contends its construction *is* the plain and ordinary meaning the term would have to a POSITA.  *O2 Micro* applies *a fortiori* to the terms "wallet management applet (WMA)" and "over-the-air (OTA) proxy" which Apple

_____

[3] If making such an assertion was all that was required for a party to avoid claim construction, claim construction would rarely take place in any case.  But that is not the law.  Indeed, Fintiv admits as much when it recognizes that "'[c]laim construction is a matter of *resolution of disputed meanings* and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.'"  Fintiv Opening Br. at 4 (emphasis added) (citing *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)).  Fintiv proposes an alternative construction for each term which it contends is the plain and ordinary meaning.  *See* Jensen Supp. Dec., Ex. 21 (side-by-side comparison of competing constructions).  Fintiv's constructions help crystallize the disputes between the parties and, in doing so, undermine its argument that no construction is needed.

contends were coined terms without a plain and ordinary meaning.  Thus, claim construction is necessary for all of the disputed terms to resolve the parties' disagreement over claim scope.

Ignoring the well-known *O2 Micro* line of cases, Fintiv cites two other Federal Circuit cases to support its position that no construction is necessary, *U.S. Surgical* and *Finjan*, both of which are clearly distinguishable.  *See*, *e.g.*, Fintiv Opening Br. at 4-5.

First, Fintiv cites *U.S. Surgical* for the proposition that a "district court properly refused to adopt [a] claim construction that amounted to an 'undisputed restatement of what these words mean.'"  *Id*. (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). The issue on appeal was whether a new trial should be granted where the district court did not read to the jury an undisputed claim construction and the jury returned a verdict of obviousness. *U.S. Surgical,* 103 F.3d at 1566.  The Federal Circuit held that no new trial was warranted because reading the undisputed construction would not have affected the obviousness determination.  *Id*. at 1570 ("U.S. Surgical does not explain how any reasonable claim construction that it requested would have deprived the verdict of obviousness of its support").  In reaching this conclusion, the Court took pains to explain there was no actual claim construction dispute.  *Id.* at 1567 ("This information from the specification *resolved no dispute, for there was none*.");[4] *id.* ("This text, again, repeated the function in the same words as in the claim, and repeated the undisputed description in the specification").

By contrast, in this case, there are clear disputes as to the proper scope of the disputed terms (except for "provision[ing]"), all of which are likely to bear on issues of noninfringement and invalidity.  Among other things, Fintiv disputes that a "wallet management applet" must store duplicate account information, that a "widget" must be a software application, that a "mobile wallet application" must be capable of being independently downloaded and installed, that "mobile device information" refers only to hardware or software properties relating to the mobile device, and that an OTA proxy must be a software application.

---

[4] All emphasis is added unless otherwise noted.

The second Federal Circuit case Fintiv cites is *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010).  Fintiv relies on *Finjan* for the proposition that a district court "did not err in construing [a] claim phrase according to its plain meaning *because the court resolved the parties' dispute*."  Fintiv Opening Br. at 5 (citing *Finjan*, 626 F.3d at 1207).  As in *U.S. Surgical*, the Federal Circuit observed that "even on appeal, Defendants do not propose an alternative construction of [the claim term] or explain how a different definition would negate infringement of the [asserted] patent."  *Finjan*, 626 F.3d at 1207.  In contrast, as noted above, Apple has proposed constructions that are likely to bear on issues of noninfringement and invalidity in this case.  Moreover, in *Finjan*, the Federal Circuit affirmed the verdict without vacating the claim construction because the district court had resolved the parties' underlying dispute when it "rejected Defendants' construction, which required an IP address."  *Id*.  Here, in contrast, merely stating that the claim terms at issue have their "plain and ordinary meaning" will not resolve the parties' disputes and the district court should construe the disputed terms.

## B.   The Court Should Construe the Claim Terms Because They Are Technical in Nature and Potentially Confusing to the Jury

Claim construction is appropriate here for the additional reason that the disputed terms are technical in nature and construing them would assist the jury.  Fintiv did not dispute that the majority of the disputed terms were technical.  Nor did Fintiv contend that lay jurors are likely to be familiar with terms like "wallet management applet (WMA)" or "over-the-air (OTA) proxy."  Rather, Fintiv contends that the terms are "comprehensible to one of ordinary skill in the art based on the teaching of the claims and specification."  *See*, *e.g.*, Fintiv Opening Br. at 7.  But even if that were true, the jurors are unlikely to qualify as persons of ordinary skill in the art, and in all likelihood will find the disputed claims terms confusing without construction by the Court.  *See* Turnbull Dec., ¶¶67, 80, 90, 99, 103, 108[5]; s*ee also Whirlpool Corp. v. TST Water, LLC*, No.

---

[5] Though Apple's constructions should prevail based on the arguments and evidence presented in its opening claim construction brief, Apple nevertheless provides expert testimony of Dr. Don Turnbull, an expert in the area of mobile device software, to further assist the Court in

2:15-cv-1528-JRG, 2016 WL 3959811, at *11 (E.D. Tex. July 22, 2016) ("[t]hese disputed terms are technical terms and are potentially confusing, so [t]he Court believes that some construction of the disputed claim language will assist the jury to understand the claims") (internal quotation omitted).

## II.   FINTIV IMPROPERLY IGNORES THE PROVISIONAL APPLICATIONS THAT ARE PART OF THE '125 SPECIFICATION

Fintiv universally ignores the disclosure of four patent applications incorporated by reference in the '125 patent which inform the meaning of the disputed claim terms and support Apple's constructions.  As explained in Apple's Opening Brief, the '125 patent incorporates by reference four provisional applications filed on December 30, 2010 and claims priority to the same date.[6]  *See* Apple Opening Br. at 1-2 (citing '125 patent, 1:8-20).  Each of the four provisional applications emphasizes a different aspect of the wallet management system, and two of the four provisional applications include documents describing a commercial wallet management system being developed by SK C&C, the original assignee of the '125 patent.

It is black letter law that material incorporated by reference in a patent document "is effectively part of the host document as if it were explicitly contained therein."  *Cook Biotech, Inc. v. Acell, Inc.*, 460 F.3d 1365, 1376 (Fed. Cir. 2006).  As such, provisional applications are as relevant to the claim construction analysis as the face of the specification itself.  *See, e.g., Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1365-66 (Fed. Cir. 2016) (relying on disclosure in provisional application incorporated by reference for construction of "byte sequence feature" that requires "machine code instructions."); *see also*

---

understanding the technology at issue, the asserted claims, and how a POSITA would understand the disputed claim terms as used in the '125 patent. *See* Declaration of Dr. Don Turnbull in Support of Apple's Proposed Claim Constructions ("Turnbull Dec."), filed concurrently herewith.

[6] The four provisional applications are Nos. 61/428,846 ("'846 provisional"); 61/428,851 ("'851 provisional"); 61/428,852 ("'852 provisional"); and 61/428,853 ("'853 provisional").  The '846, '851, '852, and '853 provisional applications are attached to the Jensen Dec. as Exs. 2 (D.I. 71-3), 3 (D.I. 71-4), 4 (D.I. 71-5) and 5 (D.I. 71-6), respectively.  The '125 patent is attached to the Jensen Dec. as Ex. 1 (D.I. 71-2).

*Cook Biotech*, 460 F.3d at 1375-77 (construing claim term based on earlier filed patent that was incorporated by reference).

And yet, Fintiv's Opening Brief did not attach, quote from, cite to, reference, or even acknowledge the existence of the four provisional applications.  Fintiv's complete failure to take into account the disclosures of the provisional applications is a wholesale failure to consider the vast majority of the '125 patent specification itself and the Court should be skeptical of Fintiv's proposed constructions since they are based on an incomplete record.  *See MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 920 (Fed. Cir. 2012) (improper to "ignore[] language in the specification and statements made during prosecution" when advancing "plain meaning").

Fintiv's failure to consider the provisional applications manifests itself in each of Fintiv's proposed constructions, which do not align with the full disclosure of the specification.[7]  As one example, the '846 provisional application states that the wallet management applet (WMA) "is unique" because it stores a copy of the user's account information "within the mobile device's [secure element] separate from the contactless card applets."  '846, ¶42.  Fintiv's construction ignores this—and other—critical disclosure about the WMA.  When all of the intrinsic evidence is considered, it is clear that Apple's construction for WMA (and all other terms) should prevail.

---

[7] Notwithstanding that Fintiv failed to produce any of the four provisional applications that are incorporated by reference in the '125 patent as required by the Agreed Scheduling Order Subsequent to Case Management Conference (D.I. 38) in this case, Fintiv nevertheless claimed priority to the December 30, 2010 filing date of the provisional applications for every asserted claim.  *See* Jensen Supp. Dec., Ex. 22 (Fintiv's Initial Disclosure of Asserted Claims, Accused Instrumentalities, and Infringement Contentions) at 4.  It is disingenuous to seek the benefit of the provisional applications for priority date purposes (presumably because Fintiv believes they contain written description support for the asserted claims), but to entirely ignore the very same disclosure for purposes of claim construction.  When the entirety of the intrinsic record is considered, Apple's constructions prevail.

## III.   CLAIM CONSTRUCTIONS

### A.   "Wallet Management Applet (WMA)" (claims 11 and 13[8])

| Apple's Proposed Construction | Fintiv's Proposed Construction |
|---|---|
| "software application for storing duplicate account specific information accessible to the mobile wallet application" | Plain and ordinary meaning. To the extent the Court requires construction the plain and ordinary meaning is "integrated functionality that enables management of a wallet related applet." |

#### 1.   WMA Is a Coined Term That Requires Construction

The term "wallet management applet (WMA)" should be construed because it is a coined term with no plain and ordinary meaning to a POSITA outside the context of the asserted patent, and the construction mandated by the intrinsic evidence, as Apple proposed, is "software application for storing duplicate account specific information accessible to the mobile wallet application."  *See* Apple Opening Br. at 10-11 (explaining and citing evidence that WMA is a coined term); *id*. at 11-14 (collecting intrinsic evidence supporting Apple's construction); Turnbull Dec., ¶¶67-73 (WMA had no plain and ordinary meaning to a POSITA circa 2010 and POSITA would not even know what acronym WMA stood for); *Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F.3d 1345, 1351 (Fed. Cir. 2019) (coined term is one which "has no ordinary meaning in the industry").

Fintiv contends that the term "wallet management applet (WMA)" does not require construction, Fintiv Opening Br. at 5, and "should be given its plain and ordinary meaning," *id*. at 7.  Fintiv reasons that no construction is necessary "because one of ordinary skill in the art would have reasonable certainty about the meaning and scope of the term from its context in the claims and specification."  Fintiv Opening Br. at 5; *see also id*. at 7 (WMA "would be readily comprehensible to one of ordinary skill in the art based on the teaching of the claims and

---

[8] In its Opening Brief, Fintiv states it "is asserting claims 11, 14, 16, 18 and 23."  But Fintiv confirmed thereafter in an email to Apple's counsel that the actual asserted claims are 11, 13, 14, 16, 17, 18, 20, 21, 22, 23, 24, and 25, as listed in Fintiv's Preliminary Infringement Contentions served on May 20, 2019.  Jensen Supp. Dec., Ex. 22 at 1.

specification").[9]  At most, this amounts to a recitation of the well-known and uncontroversial claim construction standard that claims should be construed from the perspective of a POSITA and in the context of the intrinsic evidence.[10]  But merely because a POSITA would understand a newly-coined term does not mean that a lay jury would understand it or that the term has a plain and ordinary meaning, nor does it mean construction is unnecessary where the parties disagree on how a POSITA would understand the term.  To the contrary, it is precisely because the parties dispute how a POSITA would understand the term as used in the patent—regardless of whether it is considered a coined term or not—that construction is necessary.  *O2 Micro*, 521 F.3d at 1361 (construction necessary when "'ordinary' meaning does not resolve the parties' dispute").

### 2.  The Court Should Adopt Apple's Proposed Construction

Once the Court determines that a construction is in fact needed, Apple's proposal should prevail.  In fact, Fintiv's introductory description of WMA supports Apple's proposed construction.  That introduction cites the '125 patent for the proposition that the WMA stores "account specific information of the contactless card apple[t] (e.g. credit card number, expiration date, security code, PIN, etc.)" to enable the user to "view and manage the information stored in the WMA 21 applet through the corresponding widget."  Fintiv Opening Br. at 6 (quoting '125 patent, 8:60-9:5).  This supports Apple's construction in two ways: (1) it says the WMA stores a copy of the "account specific information," just as Apple's construction requires; and (2) it says the duplicate account information in the WMA enables the user to view the account information which is reflected in Apple's construction requiring that the "information [is] accessible to the mobile wallet application" where the widget is located.

---

[9] Both parties agree that WMA is "readily comprehensible" to a POSITA who has studied the intrinsic evidence, they simply disagree on how a POSITA would understand the term.

[10] Apple agrees with this standard—indeed, this standard is what compels Apple's construction. Unlike Fintiv, who ignores the majority of the intrinsic evidence and whose proposed construction is treated as an afterthought in its own brief, Apple's proposed construction is driven by the intrinsic evidence itself as it would be understood by a POSITA.  *See* Apple Opening Br. at 11-14; Turnbull Dec., ¶¶74-79.

Rather than argue in favor of its own construction, Fintiv focuses entirely on rebutting Apple's proposed construction.  Specifically, Fintiv argues: (1) that construing WMA to be a software application "improperly attempts to read specific examples into the claim language," Fintiv Opening Br. at 7; and (2) that "Apple also improperly asks this Court to read limitations into the claim by requiring that the 'wallet management applet (WMA)' store duplicate account specific information,"  Fintiv Opening Br. at 8.  Both of Fintiv's arguments are based on the faulty premise that there must be "lexicography or disclaimer" for Apple to prevail.  Fintiv Opening Br. at 7.  In other words, according to Fintiv, unless the patentee acted as its own lexicographer by explicitly redefining a claim term with a special definition different from its ordinary meaning or expressly relinquished claim scope in the specification or file history, a claim term cannot be construed commensurate with the disclosed embodiments.

But, as Apple explained in its Opening Brief, Fintiv's assertion that the law requires there to be an instance of "lexicography or disclaimer" when construing a *coined* term is flatly wrong as confirmed by the *Iridescent* case:

> The question here, however, is not whether Iridescent narrowed the scope of the disputed term during prosecution from its full ordinary and customary meaning. Rather, *because the disputed term is a coined term*, meaning it has no ordinary and customary meaning, *the question is whether the intrinsic evidence provides objective boundaries* to the scope of the term....In these circumstances, where there is no clear ordinary and customary meaning of a coined term of degree, *we may look to the prosecution history for guidance without having to first find a clear and unmistakable disavowal*").

Apple Opening Br. at 10-11 (quoting *Iridescent*, 933 F.3d at 1353).  Thus, Fintiv's primary argument—*i.e.*, that WMA must be broader than described because the permissive word "may" (which is not a lexicographical term or disclaimer) is sometimes used in the specification—is legally incorrect.  *See, e.g.*, Fintiv Opening Br. at 8-9 (quoting '125 patent, 7:38-50 ("WMA 21 applet *may* be provided by duplicating the account information")).  Indeed, the Federal Circuit recently reiterated this point in *Iridescent*, construing the claim term "high quality of service connection" as "connection speed of at least approximately one megabit per second and...packet loss requirements that are about $10^{-5}$ and latency requirements that are less than one second,"

notwithstanding intrinsic evidence which said the connection "*may be viewed*…as having [those characteristics]."  933 F.3d at 1352-54.

Even if "wallet management applet" were not a coined term, the intrinsic evidence still compels Apple's construction because "the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *Trustees of Columbia Univ.*, 811 F.3d at 1364; *see also id.* at 1363 ("Our case law does not require explicit redefinition or disavowal."); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1318 (Fed. Cir. 2014) ("The fact that [a particular characteristic] is 'repeatedly and consistently' used to characterize the invention strongly suggests that it should be read as part of the claim."). The specification of the '125 patent, including the provisional applications, so repeatedly and consistently uses the term WMA to refer to a software application for storing duplicate account specific information accessible to the mobile wallet application that it defines that term by implication.  *See*, *e.g.*, '846, ¶42; '851, ¶¶89-90; '852, ¶¶62, 76-77; '853, ¶78; '125 patent, 9:45-48, 7:43-47); Turnbull Dec., ¶¶74-79.

### a.  The WMA is a Software Application

Fintiv admits that the term "wallet management applet" "is used throughout the specification."  Fintiv Opening Br. at 5.  Each and every time, the WMA is described as a software application for storing duplicate account specific information accessible to the mobile wallet application.  *See* Apple Opening Br. at 11-14 (collecting intrinsic evidence re WMA).  A representative example—from one of the provisional applications that Fintiv ignores—states: "The *WMA 21 is a software application* to reside within the within the secure element of the mobile device which stores account specific information such as a credit card number."  '846, ¶42.  As explained in Apple's Opening Brief, the intrinsic evidence universally supports Apple's proposed construction.  Apple Opening Br. at 11-14 (discussing '846, ¶59; '851, ¶¶89-90; '852, ¶¶62, 76-77; '853, ¶78; '125 patent, 9:45-48, 7:43-47).

In an attempt to criticize Apple's proposed construction, Fintiv implies that in certain specification embodiments the WMA may be an applet, as opposed to a software application. *See* Fintiv Opening Br. at 7 (the WMA "may be implemented in a variety of ways, including at least applets or software applications.).  But Fintiv does not even attempt to explain any difference between an "applet" and a "software application" and, among other things, ignores the glossary in the '851 provisional which states that an applet is a "[r]epresentation of a chip *application software* and/or data" and that "*[i]n this document, it refers to an application* on a Java card." '851, Requirements Use Cases at p. 50.  Where, as here, a term is "repeatedly and consistently" described in a particular way, that is meaning of the term that should be adopted. *VirnetX*, 767 F.3d at 1318.

### b.    The WMA Stores Duplicate Account Information

The specification also repeatedly and consistently characterizes the WMA in terms of its function to store duplicate account information.  *See* Apple Opening Br. at 11-14 (collecting intrinsic evidence re WMA).  This is clear, for example, from the '846 provisional which explains:

> The WMA 21 is a software application to reside within the within the secure element of the mobile device which *stores account specific information* such as a credit card number. *WMA 21 is unique in that, its primary purpose is to cause contactless card applet 23 account information to be stored within the mobile device's SE* separate from the contactless s card applets 23. As the issuers of contactless card applets23 do not allow direct access into the applets themselves, *duplicate account information may be stored separately within the WMA 21* in order for the mobile wallet application to view account specific information (e.g. credit card number, security code, PIN, expiration date, and etc.).

'846, ¶42; *see also id*., ¶59; '851, ¶¶89-90; '852, ¶¶62, 76-77; '853, ¶78; '125 patent, 9:45-48, 7:43-47).  The "primary purpose" of the WMA, and the precise thing that makes it "unique," is that it stores "duplicate account information."  '846, ¶42.

Fintiv cites a single passage, pasted below, to support its assertion that the specification discloses an alternative embodiment in which the WMA does not store duplicate account information.  Fintiv Opening Br. at 8-9 (quoting '125 patent, 7:38-50).

> The respective account information or **WMA 21 applet _may_ be provided by duplicating the account information associated with the contactless card** when the TSM system receives contactless card applets from [the service providers] to provision into the mobile device 100. **_Alternatively_, [the service provider] providing the contactless card applet may provide the account related information separately to the TSM system for provisioning.**

(emphasis by Fintiv).  But this passage says nothing about what the WMA stores.  It merely says that the service provider can send the account specific data for the WMA to the TSM in two ways: (1) together with the corresponding contactless card applet (*i.e.*, "when the TSM system receives contactless card applets") or (2) "separately" from the contactless card applet.  In both scenarios, the WMA will store duplicate account information when it is provisioned on a mobile device.  Thus, there is no "alternative" embodiment where the WMA does not store duplicate account information and Fintiv's argument fails.

Fintiv also has no answer for why it proposes to construe WMA in a manner unrelated to the purpose of the alleged invention.  *See In re Abbott Diabetes Care, Inc.*, 696 F.3d 1142, 1149-1150 (Fed. Cir. 2012) (construing term in accordance with "the primary purpose of the invention").  The '125 patent states that it is necessary to store duplicate account information in a WMA because the contactless card applets that store account information "do not allow direct access into the applets themselves."  *See* Apple Opening Br. at 11-13 (citing, *e.g.*, '846, ¶42).  If the WMA does not do so, there is no way for the mobile wallet application, or by extension the user, to "view account specific information" stored in the CCA, such as the "credit card number, security code, PIN, [and] expiration date."  '846, ¶42; *see also* '125 patent, 7:32-37.  The patent thus explains that it is necessary to provision a WMA corresponding to the CCA that stores "duplicat[e] account information."  '125 patent, 7:43-47.  This duplicate information is, like the CCA, stored in the SE and therefore secure, but unlike the CCA may be accessed via the mobile wallet.  *Id.*; *see also, e.g.*, '851, ¶90; '846, ¶42; '853, ¶78.  This solves the very problem the patent—and Fintiv—say existed in the prior art: "prior art implementations did not enable a user to 'view any account specific information stored within the SE [secure element].'"  Fintiv

Opening Br. at 1 (citing '125 patent, 2:19-29). Fintiv thus itself admits that Apple's construction embodies the patent's solution to the purported accessibility problem.

### 3.    Fintiv Fails to Support Its Proposed Alternative Construction

Fintiv presents no argument in support of its alternative construction, stating only that it "is the plain and ordinary meaning of the term consistent with the specification" without explanation. Fintiv Opening Br. at 9. Apple has already explained at length why this construction is inappropriate (*see* Apple Opening Br. at 14-16), and Fintiv's abject failure to support its own construction is further proof that it is not appropriate. Apple's proposed construction, which is how a POSITA would have understood WMA, should be adopted. Turnbull Dec., ¶¶74-79.

### B.    "Widget" (claims 11, 18, and 23)

| Apple's Proposed Construction | Fintiv's Proposed Construction |
| --- | --- |
| "user interface software application" | Plain and ordinary meaning. To the extent the Court requires construction the plain and ordinary meaning is "integrated functionality that relates to applications related to a financial institution transportation account, and the like." |

Precedent supports the need to construe the claim term "widget," not only because it is a technical term whose meaning is disputed by the parties but also because the '125 patent prescribes it with a meaning that differs from its ordinary usage as a gadget or gizmo. *See* Apple Opening Br. at 16 (citing *Whirlpool*, 2016 WL 3959811, at *11 ("[t]hese disputed terms are technical terms and are potentially confusing, so [t]he Court believes that some construction of the disputed claim language will assist the jury to understand the claims") (internal quotation omitted)); Turnbull Dec., ¶80 (POSITA would understand widget differently than the lay meaning).

Fintiv protests Apple's construction as an alleged attempt to narrow the claim to a specific embodiment and contends that "[t]he specification provides various examples of what can constitute a 'widget.'" Fintiv Opening Br. at 10. But two of the three passages Fintiv cites

support *Apple's* proposed construction and the third is consistent with it.  The passage at column 5, lines 6-9 states that "[w]idgets may be an application configured to interface with a user of the mobile device" which is nearly identical to Apple's proposed construction (*i.e.*, "user interface software application").  The passage at column 4, lines 57-61 describes the widget as an "application[] stored at the application level."  This supports Apple's construction, which recognizes that widgets are software applications, and contradicts Fintiv's construction of widget as mere "integrated functionality."  And column 5, line 66 to column 6, line 4 simply states that "the widget representing the virtual card may reside within the mobile wallet application" which is also consistent with Apple's construction.

And Fintiv ignores the majority of the intrinsic evidence by not citing or discussing any of the provisional applications.  For instance, the '851 provisional application describes the widget as a "widget binary file."  '851, Requirements Use Cases at pp. 18-19, 44; *see also*, *e.g.*, '853, Business Requirements at p. 30 (describing widget as a "downloadable sub module of a wallet client" which itself is a "downloaded mobile application"); '846, ¶53.  A POSITA would understand "binary file" and "downloadable sub module"—which are used to describe widget— to refer to software applications.  Turnbull Dec., ¶¶86.  When this intrinsic evidence (and that which is collected and discussed in Apple's Opening Brief at 16-18) is considered, it is clear that the specification "repeatedly and consistently" describes widget as user interface software application, which is strong evidence that this meaning of the term should be adopted.  *VirnetX*, 767 F.3d at 1318 ("The fact that [a particular characteristic] is 'repeatedly and consistently' used to characterize the invention strongly suggests that it should be read as part of the claim."); *see also In re Abbott*, 696 F.3d at 1149-1150.

Fintiv also attempts a claim differentiation argument, contending that widget must be broader than a user interface software application because claim 16 states that the widget is "an application configured to interface with a user of the mobile device" and dependent claim 24 states that "the widget is configured to include a user interface."  Fintiv Opening Br. at 11.  But Fintiv's claim differentiation argument fails because "the doctrine of claim differentiation can

15

not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005) (citing *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998).

As an initial matter, Fintiv's argument is premised on the erroneous idea that claim differentiation "requires" independent claims to be interpreted more broadly than their dependent claims. *See* Fintiv Opening Br. At 11. This is a distortion of the law, which in fact holds that the doctrine "only creates a presumption that each claim in a patent has a different scope; it is not a hard and fast rule of construction." *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000); *see also e.g.*, *CardSoft, LLC v. VeriFone, Inc.*, 807 F.3d 1346, 1352 (Fed. Cir. 2015) ("[C]laim differentiation is merely a presumption. It is a rule of thumb that does not trump the clear import of the specification.") (citations omitted). The *presumption* of claim differentiation is overcome here by the overwhelming weight of the intrinsic evidence, which consistently characterizes "widget" as a "user interface software application" that is central to the purpose of the alleged invention. As discussed in the preceding paragraphs and in Apple's Opening Brief, *every* embodiment in the '125 patent and its four provisionals describes the widget as a user interface software application. *See* Apple Opening Br. at 17-18. Fintiv does not dispute this.

The meaning of widget as a "user interface software application" is further confirmed because that "achieve[s] an object of the invention." *Seachange*, 413 F.3d at 1370; *see also Kraft*, 203 F.3d at 1368 (the purpose of the claimed back panel "is to protect the bottom of the tray compartments against indentation and damage" and the relatively rigid characteristic of the panel "promotes such protection"). Here, the purported inventive concept of the '125 patent is the stated advancement of allowing the user to "view the details related to the contactless payment applets (e.g., account number, expiration date, security code, balance and the like)," which is accomplished by duplicating account information in a WMA that can be accessed via a widget by the user. '125 patent, 2:13-15; *see also id.*, 2:27-28. Fintiv agrees that this was a

purported advancement over the art.  *See* Fintiv Opening Br. at 1 ("prior art implementation did not enable a user to 'view any account specific information stored within the SE'" (citing '125 patent, 2:19-29)).  The widget, which all agree is the only user interface component that the '125 patent describes, must be a user interface software application in order to serve this purpose.

Where, as here, the written description establishes that every disclosed embodiment achieves a necessary object of the invention, a limitation on the scope of the claim term is imposed by implication.  *See Seachange*, 413 F.3d at 1369 (citing *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1351-52 (Fed. Cir. 2004) (construing claim to require feature that was "central to the functioning of the claimed invention"); *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1369-70 (Fed. Cir. 2003) (construing claim to include limitation because "very character of the invention" required that the limitation be part of every embodiment); *Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001) (construing claim to reflect inventor's consistent usage of claim term in specification); *Toro Co. v. White Consol. Indus.*, 199 F.3d 1295, 1300-01 (Fed. Cir. 1999) (construing claim to require a particular configuration where specification described the importance of the configuration and did not disclose others).

The only argument Fintiv makes for its alternative construction is the conclusory statement that "Fintiv's proposed construction is not narrowing and is consistent with the specification."  *See* Fintiv Opening Br. at 11.  Indeed, Apple has already explained why Fintiv's construction is vague, confusing, inappropriately non-structural, overbroad, and open-ended.  *See* Apple Opening Br. at 19-20.  Fintiv's inability to provide any support for its position fails to warrant further argument.  Apple's proposed construction, which is how a POSITA would have understood the term widget, should be adopted.  Turnbull Dec., ¶¶81-89.

### C.  "Mobile Wallet Application" (claims 11, 18, and 23)

| Apple's Proposed Construction | Fintiv's Proposed Construction |
|---|---|
| "mobile wallet software application capable of being independently downloaded and installed" | Plain and ordinary meaning. To the extent the Court requires construction the plain and ordinary meaning is "application that provides wallet functionality on the mobile device." |

Fintiv contends that "mobile wallet application" does not require construction solely on the basis of its unsupported assertion that "a person of ordinary skill in the art would have reasonable certainty about the scope and meaning of the term from its context in the claims and specification."  Fintiv Opening Br. at 11-12.  But this misses the point in two regards because, as Apple has previously explained, *see supra* section I, construction is necessary both to resolve the parties' dispute regarding claim scope and because "mobile wallet application" is a technical term that a jury is not likely to understand without construction.  *See also* Apple Opening Br. at 20 (citing *O2 Micro*, 521 F.3d at 1361 and *Iridescent*, 2019 WL 3770833, at *6)); Turnbull Dec., ¶90.

As an initial matter, Fintiv did not contest that a "mobile wallet application" is a software application as stated in Apple's proposed construction.  But, as with the two previous terms, Fintiv protests that Apple's proposed construction is nevertheless an attempt "to improperly narrow the claim to a specific embodiment and improperly attempts to read specific examples into the claim language by requiring that the 'mobile wallet application' be 'independently downloaded and installed.'"  Fintiv Opening Br. at 12.  But this both misstates Apple's proposed construction and ignores the intrinsic evidence.

Apple's proposed construction requires that the claimed mobile wallet application be "*capable* of being independently downloaded and installed."  More importantly, the '125 patent itself—including the provisional applications which Fintiv ignores—repeatedly and consistently describes the mobile wallet application as capable of being downloaded and installed on a mobile device.  *See* Apple Opening Br. at 20-22 (collecting and explaining intrinsic evidence); *see also*

*In re Abbott*, 696 F.3d at 1149-1150; *Trustees of Columbia Univ.*, 811 F.3d at 1365-66 ("As we have previously found, the 'construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction'") (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). Thus, rather than reading-in a preferred embodiment, Apple's construction is commensurate with the description of the alleged invention as set forth by the inventors themselves in the written description.

The underlying reason why the mobile wallet application must be capable of being independently downloaded and installed is reflected in the purported problem the '125 patent sought to solve. Fintiv admits that the '125 patent sought to resolve the issue, caused by the plethora of different mobile device hardware and software configurations from numerous manufacturers, of users being "bombarded with various applications that may be inapplicable to the user." *See* Fintiv Opening Br. at 1-2 (citing '125 patent, 2:30-44). And the patent's proposed solution was for a server to filter for compatible mobile wallet applications based on mobile device information and offer only the compatible applications to the user. *See, e.g.,* '125 patent, 4:64-67, 5:12-16, and 10:45-48. If the mobile wallet application came "pre-installed" on the mobile device, the stated purpose of the alleged invention could not be accomplished. *See In re Abbott*, 696 F.3d at 1149-1150 (construing term in accordance with "the primary purpose of the invention"). It is thus unsurprising that Fintiv's Opening Brief contains no citation for the naked assertion that the claimed mobile wallet application may be "pre-installed on the mobile device." Fintiv Opening Br. at 12. The patent simply does not say that, and it would be antithetical to the very purpose of the alleged invention and the problem sought to be solved.

The only intrinsic evidence Fintiv cites—column 6, lines 14-30 of the '125 patent—in fact supports Apple's construction. Indeed, the entire passage discusses the mobile wallet installation process, explaining that the installation procedure can be conducted in several ways, all of which include a download operation: 1) sending a "Wireless Application Protocol (WAP) message" to the mobile device containing a wallet application download link; 2) "download[ing

the wallet] directly to the requesting mobile device"; 3) "sen[ding the wallet] to the user in a physical medium storing the application" for download to the mobile device; and 4) any "other suitable methods for providing software applications." '125 patent, 6:19-30.  At bottom, regardless of how the mobile wallet application is provided to the mobile device for installation, all of the disclosed methods involve a transfer of the wallet from an external location to the mobile device, and so a download of the wallet to the mobile device.  *See, e.g.*, Jensen Supp. Dec., Ex. 23 (2010 New Oxford American Dictionary (Third Edition) defining "download" as copying "from one computer system to another or to a disk"); *Id.*, Ex. 24 (2009 American Heritage Dictionary (Fourth Edition) defining download in the computer science context as "[t]o transfer (data or programs) from a server or host computer to one's own computer or device.").

Even if the catchall language at the end of the passage were afforded an alternate interpretation that allowed for transferring a mobile wallet to a mobile device for installation in a manner that would not strictly be considered a download, "[t]his single sentence in the specification cannot overcome the overwhelming evidence in other parts of the specification and the provisional application[s] (described above) demonstrating that the intended definition of this term does not include [mobile wallet applications] other than [those which are capable of being downloaded and installed]." *Trustees of Columbia Univ.*, 811 F.3d at 1366.  "The patentee cannot rely on its own use of inconsistent and confusing language in the specification to support a broad claim construction which is otherwise foreclosed." *Id.*  Apple respectfully submits that, at a minimum, it is indisputable that installation is required.  As such, to the extent the Court does not agree that a download is necessary, it should construe "mobile wallet application" to mean "mobile wallet software application capable of being independently installed."

Fintiv also complains that inclusion of the word "independently" in Apple's construction "introduce[s] ambiguity," but fails to say what possible ambiguity might actually be introduced. *See* Fintiv Opening Br. at 12.  To the contrary, it is clear based on the intrinsic record that the mobile wallet application is installed independently of the standard software already present on the mobile device (*e.g.*, the operating system).  This is apparent, for example, in independent

claim 1, which is a "method for installing a wallet application in a mobile device."  Before the mobile wallet installation procedure begins, the mobile device already contains software capable of "requesting" a mobile wallet application for installation.  *See* '125 patent, claim 1; *see also* claim 7 (remote server "transmitting the mobile wallet application to the mobile device" in response to the mobile device's request).

Once more, Fintiv proposes an alternative construction for which it provides no explanation, arguing only that it "does not arbitrarily restrict" the claims.  Fintiv Opening Br. at 13.  Because a conclusory statement about what a proposed construction does *not* do is not a basis for adopting that construction, and because Fintiv ignores the majority of the specification, Fintiv's proposal should be rejected.  Apple's construction, which is how a POSITA would have understood the term "mobile wallet application," should be adopted.  Turnbull Dec., ¶¶91-98.

### D.    "SE Information" (claims 14 and 23)

| Apple's Proposed Construction | Fintiv's Proposed Construction |
|---|---|
| "information relating to the secure element" | Plain and ordinary meaning. To the extent the Court requires construction the plain and ordinary meaning is "information related to the secure element that may include at least card production life cycle, card serial number, card image number, and integrated circuit card identification." |

The entirety of Fintiv's analysis of the "SE information" term in its Opening Brief is a single paragraph and Fintiv says precious little about the term, not even that the acronym SE stands for "secure element."  Fintiv Opening Br. at 13-14.  Fintiv's argument that no construction is needed because "a person of ordinary skill in the art would understand the term 'SE information' in the context of the claims and specification," Fintiv Opening Br. at 13, misses the point of why this term requires construction: the *jury* will have no familiarity with this term, and reference to a list of hyper-technical terms recited in the specification will only serve to further confuse them, *see* Apple Opening Br. at 23-24 (citing *Whirlpool*, 2016 WL 3959811, at *11).

Fintiv's alternative construction is incorrect due to its inclusion of an overly technical list of embodiments but nevertheless confirms that Apple's construction is the correct interpretation.

Fintiv contends that no construction is necessary "as there does not appear to be a dispute regarding scope." Fintiv. Br. at 13-14; *see also id.* (arguing that Apple's proposed construction is a mere "unnecessary" "rearranging" of the existing term). If there were no dispute, Fintiv should stipulate to Apple's proposed construction. But Fintiv has refused to do so, insisting instead the plain and ordinary meaning should govern without a construction. However, there are at least two potential "plain and ordinary" readings of the phrase "SE information": (1) information *about* or *relating to* the SE and (2) information *stored in* the SE. Apple contends that only the former is covered by the term "SE information" in the context of the asserted patent. *See* Turnbull Dec., ¶¶99-100. The claims themselves do not answer which reading is correct: claim 14 states only that the SE information is "retriev[ed]," and claim 23 only that it is "capture[d]." *See* '125 patent, claims 14 and 23. Neither explains whether this is information relating to the SE or simply any information stored on the SE which conveys nothing about the SE itself.

This uncertainty should be resolved in the claim construction process, as Fintiv's plain meaning non-construction would allow for either reading. However, as is clear from the specification and confirmed by Fintiv's own alternative construction, every embodiment in the intrinsic record shows that the patentee intended for this term to apply only to the "information relating to the SE" reading of the claim term. *See* Apple Opening Br. at 23-24 (citing '125 patent, 6:52-62; '851, Requirements Use Cases at p. 15; '853, Business Requirements at pp. 16-17).

Fintiv did not advocate for its alternative construction or cite anything in support thereof, which is understandable given that Fintiv's construction is both verbose and contains a number of highly technical terms. Because Fintiv focused exclusively on its plain meaning argument, there is not an alternative construction argument to oppose. *See* Fintiv Opening Br. at 13-14.

E.     **"Mobile Device Information" (claims 14, 18, and 23)**

| Apple's Proposed Construction | Fintiv's Proposed Construction |
|---|---|
| "hardware or software properties relating to the mobile device" | Plain and ordinary meaning. To the extent the Court requires construction the plain and ordinary meaning is "mobile device related information." |

As with previous terms, Fintiv's assertion that no construction is necessary for the phrase "mobile device information" is unavailing. As explained in section I, claim construction is necessary to resolve the parties' dispute about the scope of the claim phrase and to aid the jury. For this term, Fintiv also employs a new—but incorrect—line of reasoning, arguing that "the terms 'mobile device' and 'information' are ordinary terms that any jury would understand and are used here according to that ordinary meaning." Fintiv Opening Br. at 14. But the phrase Apple proposed for construction is "mobile device information," not the two separate terms "mobile device" and "information."[11] It is well-known that combining words often imparts meaning beyond, or different than, the same words standing individually. As one example, just because someone may know what "ice" and "cream" are, does not mean they know what the phrase "ice cream" means. And if they did know what constituted "ice cream," they would know it is not merely the combination of "ice" and "cream." *See Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1062-63 (Fed. Cir. 2016). More fundamentally, however, Fintiv's approach to claim construction improperly ignores the intrinsic evidence. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) ("[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

As with every other claim term, instead of advancing its own proposed construction, Fintiv merely argues against Apple's construction. Fintiv Opening Br. at 14-15. Fintiv's primary criticism of Apple's construction is that it "improperly narrows the claim to a specific

---

[11] If Fintiv wished to separately construe either "mobile device" or "information," it could have (and should have) proposed those terms for construction. But it did not do so.

embodiment and improperly attempts to read specific examples into the claim language." *Id.* at 14. But Apple's proposed construction does no such thing. This is apparent by contrast to Fintiv's proposed construction of SE information, which expressly recites the specific examples of "card production life cycle, card serial number, card image number, and integrated circuit card identification" in the construction itself. In contrast, Apple's proposed construction for "mobile device information" is simply "hardware or software properties relating to the mobile device" and does not "read in" any specific examples from the specification or otherwise limit the types hardware or software properties that comprise mobile device information.

But Apple's proposed construction does properly allow for all of the examples and embodiments of mobile device information disclosed in the claims and specification, including the incorporated-by-reference provisional applications which Fintiv ignores. *See, e.g.*, claim 20 (mobile device information comprises "a mobile device type, a supporting Operating System (OS), a mobile service provider, a mobile device manufacturer, and a secure element (SE) type"); '125 patent, 5:9-16; *see also id.*, 10:26-34 (identifying describing "hardware, software, operating system, etc." as mobile device "attributes"). The common thread of all these examples is that they are hardware or software properties relating to the mobile device. Thus, Apple's proposed construction is *not* a limitation to one or more embodiments as Fintiv contends, but a recitation of how the claims and specification consistently and repeatedly use the phrase "mobile device information." *See Trustees of Columbia Univ.*, 811 F.3d 1363-66 ("Our case law does not require explicit redefinition or disavowal"; "the patentee's choice of preferred embodiments can shed light on the intended scope of the claims").

Fintiv also argues against Apple's proposed construction because it is purportedly "narrower than independent claims 18 and 23." Fintiv Opening Br. at 15. But the claim language that Fintiv points to actually serves to prove that Apple's construction possesses the appropriate breadth. As Fintiv notes, claim 23 recites the phrase "mobile device information comprising SE information." But SE information, which is information that relates to either the SE hardware itself or its software, *is* a hardware or software property of the mobile device, and

Apple's construction is commensurate with this disclosure.  *See, e.g.*, '125 patent, 1:40-41 ("The SE may be a smart card chip capable of storing multiple applications…").

As noted, Fintiv provides no support for its alternative construction, stating only the conclusion that its "language is not as narrowing and is consistent with the specification."  Fintiv Opening Br. at 15.  As explained in Apple's Opening Brief, and based on the intrinsic evidence, Fintiv's alternative construction is overbroad and inconsistent with the specification because it would include information that the '125 patent explains is distinct from mobile device information, such as user information.  *See* Apple Opening Br. at 25-26 (citing '125 patent, claims 18, 20-21, Fig. 1, 5:9-22, 10:26-34; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); Turnbull Dec., ¶¶105-107.  Apple's proposed construction makes clear that mobile device information is separate and distinct from user information, eliminating the risk that the jury will conflate the two.  *Id.*  Fintiv's unsupported alternative construction should again be rejected and Apple's proposed construction, which is how a POSITA would have understood the term "mobile device information," should be adopted.  Turnbull Dec., ¶¶103-107.

### F.    "Over-the-Air (OTA) Proxy" (claim 23) and "OTA Proxy" (claim 16)

| Apple's Proposed Construction | Fintiv's Proposed Construction |
|---|---|
| "mobile device software application for communicating between a secure element and a server over a mobile network" | Plain and ordinary meaning. To the extent the Court requires construction the plain and ordinary meaning is "functionality for creating a secure connection." |

Fintiv contends that the terms "over-the-air (OTA) proxy" and "OTA proxy" "do not require construction because a person of ordinary skill in the art would have reasonable certainty about the scope and meaning of these terms from their context in the claims and specification."  Fintiv Opening Br. at 15-16.  For all the reasons described in section I, construction of the OTA proxy terms is necessary.  In particular, and as discussed more fully in Apple's Opening Brief, the OTA proxy terms did not have an established ordinary and customary meaning at the time of Fintiv's alleged priority date in 2010.  *See* Apple Opening Br. at 27; *see also* Turnbull Dec.,

¶¶108-111 (OTA had no plain and ordinary meaning to a POSITA circa 2010). Fintiv cited nothing at all to contradict Apple's contemporaneous evidence showing the lack of an established meaning. *Id.* (Jensen Dec., Exs. 6-9 (D.I. 71-7 - 71-10) showing absence of OTA proxy terms in general purpose and technical dictionaries; *Id.*, Exs. 15-20 (D.I. 71-16 - 71-21) showing dearth of OTA proxy terms in issued U.S. patents or published application). Moreover, Fintiv did not dispute that the terms are technical in nature or that the jury would benefit from a construction.

It is telling that Fintiv could muster no support for its own proposed construction. *See* Fintiv Opening Br. at 17. Rather than seek to establish what it contends is the plain and ordinary meaning of the disputed term, Fintiv merely attacks Apple's proposed construction, making three deficient arguments which are addressed in turn.

First, Fintiv argues that Apple improperly "seeks to limit the meaning" of the OTA proxy terms to a "software application" and that this aspect of Apple's proposed construction "is not supported by the specification." Fintiv Opening Br. at 16. But Fintiv itself admits that "the OTA proxy is a form of software functionality." *Id.* And the specification expressly refers to the OTA proxy as a "program." '125 patent, 6:42-43 ("Once the…OTA proxy program ha[s] been downloaded…"); *id.*, 6:34-37 (TSM transmits "over-the-air (OTA) proxy program" to mobile device for installation). So, too, do the provisional applications which Fintiv ignores. *See*, *e.g.*, '851, ¶¶14-15 ("provide[s] a system to install OTA Proxy application onto the mobile device"); *id.*, ¶¶58, 83 ("OTA Proxy application 42 software"); '853, Business Requirements at pp. 4-5 ("The OTA proxy shall be a stand-alone application or a subcomponent of a wallet application"). The fact that the OTA proxy "may be included in the mobile wallet application," '125 patent, 6:61-62, or be a "subcomponent" of a wallet application, '853 at pp. 4-5, in no way means it isn't a software application. Indeed, it was commonplace to install one piece of software into another (*e.g.*, updating software with a patch or installing a macro into a program like Microsoft Word). Turnbull Dec., ¶¶117-118.

Second, Fintiv challenges whether the claimed OTA proxy "communicat[es] between a secure element and a server over a mobile network" and cites to claim 23 for support. Fintiv Opening Br. at 16. But claim 23 expressly recites a "secure element (SE)" as a claim element and requires that both the contactless card applet that WMA are "stored in the SE." Claim 23 further recites that the "OTA proxy is configured to capture mobile device information comprising SE information" and "transmit the mobile device information for registering the mobile wallet application." *See also* claim 18 ("register[ing] the mobile device and the mobile wallet application in a Trusted Service Manager (TSM) system"). Thus, by its own terms, claim 23 supports Apple's proposed construction that an OTA proxy "communicat[es] between a secure element and a server." Indeed, Fintiv admits that the specification discloses that the OTA proxy "send[s] the captured SE and mobile device information to the TSM system 120" and "receive[s] [Application Protocol Data Unit] APDU commands from the TSM system 120 to install requested issuer contactless applets 23 and correlating WMA 21 applet to be provisioned" into the secure element. Fintiv Opening Br. at 16 (citing '125 patent, 6:63-64 and 9:25-28). To the extent Fintiv contests whether the OTA proxy communications take place "over a mobile network," that question is answered by, among other intrinsic evidence, the '851 provisional application glossary, which states that "Over-The-Air (OTA) refers to any process that involves the transfer of data (including applications) to the mobile handset or any component within the mobile handset *via the mobile network*." '851, Requirements Use Cases at p. 55.

Third, Fintiv argues that the term "server" in Apple's construction is ambiguous because it "leaves open a dispute as to whether the communication must be with a single server." Fintiv Opening Br. at 17. Apple's construction does not limit the OTA proxy communications to a single server and thus there is no dispute nor ambiguity. As the '125 itself states, "The disclosed WMS 110 may reside within TSM system 120 or independent of the TSM system 120." '125 patent, 5:28-29. If it would resolve Fintiv's objection to Apple's proposed construction, Apple would agree to a construction that referred to "one or more servers" instead of "a server."

27

As with the other claim terms, Fintiv gives short shrift to its own alternative construction and makes no meaningful argument in support thereof.  Fintiv Opening Br. at 17.  Consistent with the weight of the intrinsic evidence and the understanding of a POSITA, "OTA proxy" should be construed to mean "mobile device software application for communicating between a secure element and a server over a mobile network."  *See*, *e.g.*, '853, ¶77 (OTA proxy "is necessary to provision…account information *into the mobile device's SE*."); *id.*, Business Requirements for SK C&C m-Commerce Platform at p. 44 ("The OTA proxy shall provide the install, load, personalization, and life-cycle management of smart card applets on SE interfacing with TSM."); *id.,* pp. 4-5; '125 patent, 7:55-62 ("the OTA proxy gathers mobile device and SE specific information…and sends it over to TSM system"); *id.*, 9:25-35; '846, ¶47; '851, ¶72, ¶85; Turnbull Dec., ¶¶108-122.

### G.    "Provision[ing]" (claims 11 and 23)

| Apple's Proposed Construction | Fintiv's Proposed Construction |
|---|---|
| "provid[e/ing] and/or mak[e/ing] available for use" | Plain and ordinary meaning. To the extent the Court requires construction the plain and ordinary meaning is "making available for use." |

Fintiv has not disputed that (1) Apple's proposed construction accurately defines "provision[ing]" in the context of the '125 patent or (2) that a jury would benefit from a construction given the highly technical context in which the term is used.  *See* Apple's Br. at 30.

With respect to the first point, Fintiv admits that "there does not appear to be a dispute regarding [claim] scope."  Fintiv Opening Br. at 17-18.  In such a circumstance, where the parties have agreed to a construction, courts regularly adopt such a construction.  *See*, *e.g.*, *Stasher, Inc. v. Zip Top, LLC et al.*, No. W-18-cv-00312-ADA, D.I. 42, Claim Construction Order (W.D. Tex. Jun. 7, 2019) ("Court will adopt the parties' agreed construction of 'boundary.'").  Fintiv entirely ignores the second point, suggesting that the Court would be construing the term "simply for the sake of doing so."  Fintiv Opening Br. at 17.  But that is not the case.  The term "provision[ing]" is used in a highly technical context in the asserted claims.

Claim 23 recites "an over-the-air (OTA) proxy configured to provision the contactless card applet, a widget corresponding to the contactless card applet, and the WMA" and claim 11 similarly requires "provisioning the selected contactless card applet, the widget, and the WMA." Without a construction, the jury could be confused as to what it means to "provision" a contactless card applet, a widget, and a WMA.  Such an argument is supported by the case law and is in no way "disingenuous," as Fintiv contends.  *See* Fintiv Opening Br. at 18; *see also*, *e.g.*, *Whirlpool*, 2016 WL 3959811 at *11.

Instead of addressing this issue, Fintiv presents a red herring by arguing that the accused Apple Pay feature practices provisioning.  *See* Fintiv Opening Br. at 18 (citing an Apple webpage stating "Apple Pay capable device…has been *provisioned* with payment cards that you support" (emphasis in original)).  In so arguing, Fintiv violates the longstanding principle that a court's claim construction should not be driven by whether it will, or will not, cover an accused product.  *See*, *e.g.*, *Neomagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002) ("It is well settled that claims may not be construed by reference to the accused device") (citing *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (en banc)).

Because, as Fintiv admits, "there does not appear to be a dispute regarding scope," Fintiv Opening Br. at 17-18, and construing the term would be helpful to the jury, the Court should provide the jury with guidance in the form of an undisputed claim construction which explains that "provision[ing]" simply means "providing and/or making available for use."

## IV.   CONCLUSION

For the aforementioned reasons, Apple respectfully requests that the Court adopt its proposed constructions of the disputed claim terms.

Dated: October 3, 2019

Respectfully submitted,

/s/Travis Jensen
Claudia Wilson Frost – Lead Counsel
Texas Bar No. 21671300
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
609 Main, 40th Floor
Houston, TX 77002
Telephone: 713.658.6400
Facsimile: 713.658.6401
cfrost@orrick.com

Travis Jensen
California Bar No. 259925
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
1000 Marsh Rd.
Menlo Park, CA 94025
Telephone: 650.614.7400
Facsimile: 650.614.7401
tjensen@orrick.com

J. Stephen Ravel
Texas State Bar No. 16584975
J.R. Johnson
Texas State Bar No. 24070000
**KELLY HART & HALLMAN LLP**
303 Colorado, Suite 2000
Austin, Texas 78701
Tel. (512) 495-6429
Fax (512) 495-6401
steve.ravel@kellyhart.com
jr.johnson@kellyhart.com

ATTORNEYS FOR APPLE INC.

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 3, 2019, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5.  Any other counsel of record will be served by a facsimile transmission or first-class mail.

/s/Travis Jensen
Travis Jensen